IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Nickey Gregory Company, LLC, and Poppell's Produce, Inc., | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 6:07-3605-HMH |
| vs. | ) ) | **OPINION & ORDER** |
| AgriCap, LLC, a/k/a AgriCap Financial Corporation, | ) ) ) | |
| Defendant. | ) ) | |

This matter is before the court on Plaintiffs Nickey Gregory Company, LLC ("Nickey

Gregory") and Poppell's Produce, Inc.'s ("Poppell's Produce") (collectively "Plaintiffs") claims

alleging a violation of the Federal Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a –

499s ("PACA"). Therefore, the court has jurisdiction over this matter. Plaintiffs contend that

they are beneficiaries of the PACA trust held by non-party Robison Farms, LLC ("Robison

Farms") and that Defendant AgriCap, LLC ("AgriCap") has wrongfully retained trust assets.

Plaintiffs request that the court order that AgriCap disgorge the assets acquired from Robison

Farms.

The parties agreed that live testimony was unnecessary to decide this matter. The parties

submitted evidence and testimony to the court in the form of stipulated facts, evidentiary

documents, and fact witness and expert testimony. The court held a hearing on December 10,

2008. After consideration of all of the relevant evidence of record and the arguments of the

parties, the court now declares its findings of fact and conclusions of law in accordance with

Rule 52(a)(1) of the Federal Rules of Civil Procedure. Should a finding of fact constitute a

conclusion of law, or vice versa, the court adopts it as such and directs that it be treated accordingly.

## I. Factual and Procedural Background

1.  Nickey Gregory is a Georgia company engaged as a wholesale dealer of agricultural commodities. It has held a PACA license since 2005. (Joint Stipulation ("J.S.") ¶ 1.)

2.  Poppell's Produce is a Georgia corporation engaged as a wholesaler of agricultural commodities. It has held a PACA license since 1995. (Id. ¶ 2.)

3.  AgriCap is a company that provides financial services.

4.  Non-party Robison Farms was a South Carolina company, licensed as a PACA dealer and distributor of produce, until it ceased operations in July 2006. (Id. ¶ 3.)

5.  In early March 2005, Brian Dunbar of PBC Consultants, a representative of Robison Farms approached AgriCap about entering into a financial arrangement with AgriCap to provide Robison Farms with increased liquidity. (Id. ¶ 4.); (Def.'s Mem. Supp. Summ. J. Ex. 1 (Richard Jones ("Jones") Aff. ¶ 10).)

6.  On March 11, 2005, AgriCap submitted a letter setting forth the preliminary term sheet for a financing arrangement with Robison Farms identifying Robison Farms as "Borrower" and AgriCap as "Lender." (Pls.' Mem. Supp. Summ. J. Ex. G (Preliminary Term Sheet).); (J.S. ¶ 5.)

7.  Following an examination of Robison Farms' application, AgriCap indicated that it would only enter into a financing arrangement with Robison Farms if (1) Robison Farms obtained additional capital to pay off the debts to PACA creditors and (2) Robison Farms' payment period to creditors was shortened. (Def.'s Mem. Opp'n Summ. J. Ex. 1 (Jones Aff. ¶¶ 11-13).)

8.    Cindy Robison ("Robison"), Robison Farms' principal, injected additional capital into Robison Farms, which included a combination of additional financing and vendor payment plans consisting of approximately $100,000.00 obtained as a result of a secured loan with Robison.  (Id. Ex. 1 (Jones Aff. ¶ 13).)

9.    In addition, Robison Farms entered into agreements with some of its PACA merchants by which the merchants relinquished any PACA trust claims in return for a payment schedule by Robison Farms.  (Id. Ex. 1 (Jones Aff. ¶¶ 13, 20).); (Def.'s Mem. Opp'n Summ. J. Ex. 12 (Agreement with Leone Pizzini & Sons, Inc.).)

10.   Prior to agreeing to enter into a financing arrangement with Robison Farms, AgriCap retained Evergreen Collateral Consulting ("Evergreen") to perform a field examination of Robison Farms' financial condition.  (J.S. ¶ 6.)

11.   From April 26 to April 28, 2005, Evergreen visited Robison Farms' Greenville location and conducted a full scope examination of Robison Farms' financial condition, including testing the accounts payable, accounts receivable, cash, taxes, and financials for the 12-month period ending March 31, 2005.  (Id. ¶ 7.)

12.   Evergreen prepared a Prospect Examination Report ("the Evergreen Report") that it submitted to AgriCap.  (Id. ¶ 8.)

13.   With respect to Robison Farms' accounts payable, the Evergreen Report found that Robison Farms did not currently purchase from PACA growers and that "there are no PACA lien issues."  (Def.'s Ex. 4 (Evergreen Report at AC00366).)  Although the report identified some accounts payable that were not current, the Evergreen Report stated that "[m]anagement indicated that Robison Farms is working with vendors on payments and

that the vendors with past due balances were still [selling produce to Robison Farms]." (<u>Id.</u> Ex. 4 (Evergreen Report at AC00367).)  The report did not identify any PACA violations.  (Def.'s Mem. Opp'n Summ. J. Ex. 1 (Jones Aff. ¶ 18).)

**A.    The Agreement between AgriCap and Robison Farms**

14.    Upon Robison Farms' April 2005 re-capitalization, AgriCap agreed to enter into a financing arrangement with Robison Farms.  On or about May 12, 2005, AgriCap and Robison Farms entered into a contract titled "Factoring Agreement" (the "Agreement"), pursuant to which AgriCap purportedly purchased accounts receivable from Robison Farms.  (J.S. ¶ 9.)

15.    Further, the parties entered into a "Security Agreement."  (Pls.' Mem. Supp. Summ. J. Ex. J (Security Agreement).)  The Security Agreement provided AgriCap with a blanket security interest on all of Robison Farms' assets.  (<u>Id.</u> Ex. J (Security Agreement).)

16.    On May 16, 2005, AgriCap filed a UCC-1 Financing Statement with the South Carolina Secretary of State to perfect its security interest in the collateral under the Security Agreement, which consisted of all of Robison Farms' assets.  (<u>Id.</u> Ex. M (UCC-1 Financing Statement).)

17.    In addition, Robison executed a Personal Guaranty Agreement and a Subordination Agreement.  (<u>Id.</u> Ex. K (Personal Guaranty) & Ex. L (Subordination Agreement).)

18.    By the terms of the Agreement, AgriCap purported to purchase eligible accounts receivable and immediately advance 80% of a receivable's face value, with the remaining 20% held in reserve until the receivable was collected.  (Def.'s Ex. 1 (Agreement, Section 2.2.2) ("the purchase price of any Eligible Receivable purchased under this Agreement

shall be the sum of the Advance plus any Reserve payable by Buyer to Seller relating to such Receivable.").)  From this Reserve Account, AgriCap deducted its transaction fees, which consist of a factoring fee of 1.5% of the receivable amount, a factoring advance charge calculated on the amount of time that passed from AgriCap's advance of funds to its collection on the account, and a finance fee that would be paid if the receivable was not collected within its 30-day terms.  (Id. Ex. 1 (Agreement, Sections 3.2, 3.3); (J.S. ¶ 16).)  In addition, Robison Farms paid a  monthly interest charge on each advance at the Prime Rate plus 6%.  (Id. Ex. 1 (Agreement, Sections 3.3, 3.4).)  AgriCap also reimbursed itself for other miscellaneous charges, fees, and expenses.  (Pls.' Mem. Supp. Summ. J. Ex. Q (Client Activity Statement).)

19.  The financing arrangement between the parties provided benefits to Robison Farms. Prior to entering into the Agreement, Robison Farms had to wait until accounts receivable were paid to receive any money.  However, the financing arrangement permitted Robison Farms to immediately receive money that was available to use to satisfy its PACA "prompt payment" obligations to the wholesalers from which Robison Farms purchased produce.  (Def.'s Ex. 14 (Vincent Donahue ("Donahue") Report ¶¶ 5, 17, 18).)

20.  As part of the Agreement, Robison Farms warranted and represented that it would use the funds Robison Farms received for "general working capital purposes" only.  Robison Farms also warranted and represented that it would not make any loans to any Robison Farms' shareholders absent written consent from AgriCap.  (Def.'s Ex. 1 (Agreement, Section 6.2(g)-(h)).); (J.S. ¶ 13.)

21.    On or about April 17, 2006, Robison Farms requested an increase in the advance rate from 80% to 90%, which AgriCap approved.  (Id. ¶ 27.)

22.    On July 18, 2006, AgriCap learned that Robison Farms had ceased operations. (Pls.' Mem. Supp. Summ. J. Ex. P (Clayton Tamura ("Tamura") Memorandum of 7/18/06).)  AgriCap prepared an internal memorandum noting that as of July 18, 2006, Robison Farms owed AgriCap $111,892.55 for advances, plus ledger debt of $19,267.50, and estimated commissions of $1,918.12, and had eligible accounts receivable of $126,865.89 to be collected to satisfy these obligations.  (Id. Ex. P (Tamura Memorandum).)   The internal memorandum concludes that AgriCap should contact Robison Farms to determine their position with PACA creditors and actively collect the remaining receivables.  (Id. Ex. P (Tamura Memorandum).)

23.    AgriCap collected $126,725.46 of Robison Farms' receivables after Robison Farms ceased operations, and applied it to the balance owed AgriCap under the terms of its financing arrangement.  (Id. Ex. Q (Client Activity Report).)

**B.    Robison Farms' Cash Position as a Result of the Agreement**

24.    Over the course of its financial relationship with Robison Farms, AgriCap received $4,053,596.21 in cash receipts from Robison Farms' accounts receivable.  (J.S. ¶ 23.)

25.    In turn, AgriCap paid to Robison Farms a total of $3,964,905.46, consisting of $3,953,638.99 paid directly to Robison Farms and $11,266.47 paid directly to one of Robison Farms' creditors to satisfy a debt of Robison Farms.  (J.S. ¶ 24); (Def.'s Dec. 12, 2008 Letter & Dec. 10, 2008, Hearing.)

26.    AgriCap retained $88,690.75, of Robison Farms' trust assets pursuant to the Agreement.

27.     AgriCap is owed $8,001.03 by Robison Farms under the terms of the Agreement.

Following Robison Farms' bankruptcy filing on September 18, 2006, AgriCap wrote-off

the $8,001.03.  (Id. ¶ 36.)

**C.      Plaintiffs' Sales to Robison Farms**

28.     Nickey Gregory's claims in this action stem from the following produce sales to Robison

Farms made between June 8, 2006 and July 13, 2006.

| Invoice Date | Amount |
|---|---|
| June 8, 2006 | $2,355.50 |
| June 9, 2006 | $3,845.50 |
| June 12, 2006 | $2,983.25 |
| June 14, 2006 | $2,257.50 |
| June 15, 2006 | $1,819.75 |
| June 16, 2006 | $2,598.25 |
| June 18, 2006 | $2,412.50 |
| June 19, 2006 | $4,852.75 |
| June 20, 2006 | $2,583.00 |
| June 21, 2006 | $3,120.75 |
| June 22, 2006 | $3,980.75 |
| June 25, 2006 | $3,032.25 |
| June 26, 2006 | $3,519.75 |
| June 27, 2006 | $3,070.00 |
| June 28, 2006 | $1,526.25 |
| June 29, 2006 | $3,010.25 |
| June 30, 2006 | $3,455.50 |
| July 2, 2006 | $2,611.00 |
| July 3, 2006 | $2,216.00 |
| July 5, 2006 | $2,961.00 |
| July 6, 2006 | $1,761.50 |
| July 7, 2006 | $2,915.00 |
| July 10, 2006 | $2,969.25 |
| July 11, 2006 | $2,729.00 |
| July 12, 2006 | $1,575.00 |
| July 13, 2006 | $5,396.50 |
| | $75,557.75 |

(J.S. ¶ 17.)

29.     Poppell's Produce's claims in this action stem from produce sales to Robison Farms made

between May 11, 2006 and July 13, 2006.

| Invoice Date | Amount |
|---|---|
| May 11, 2006 | $2,607.50 |
| May 15, 2006 | $3,263.60 |
| May 18, 2006 | $2,897.70 |
| May 22, 2006 | $3,090.70 |
| May 23, 2006 | $2,451.60 |
| June 1, 2006 | $2,490.00 |
| June 2, 2006 | $1,645.60 |
| June 8, 2006 | $1,723.40 |
| June 12, 2006 | $2,194.00 |
| June 19, 2006 | $2,527.50 |
| June 22, 2006 | $2,866.90 |
| June 29, 2006 | $2,426.60 |
| July 3, 2006 | $3,131.80 |
| July 6, 2006 | $3,226.40 |
| July 10, 2006 | $3,134.00 |
| July 13, 2006 | $3,370.00 |
| | $43,047.30 |

(Id. ¶ 18.)

30.     Each of the invoices issued by Nickey Gregory and Poppell's Produce contained the

following statement:

The perishable agricultural commodities listed on this invoice are sold subject to
the statutory trust authorized by section 5(c) of the Perishable Agricultural
Commodities Act, 1930 (7 U.S.C. § 499e(c)).  The seller of these commodities
retains a trust claim over these commodities, all inventories of food or other
products derived from these commodities, and any receivables or proceeds from
the sale of these commodities until full payment is received.

(Id. ¶ 19.)

31.     Each of the unpaid invoices issued by Nickey Gregory and Poppell's Produce to Robison

Farms that remain unpaid and form the basis for Plaintiffs' trust claims, reflect payment

8

terms "Net 21 Days" even though Plaintiffs and Robison Farms had no written agreement between the parties.  (Id. ¶ 21.)

32.  Further, Nickey Gregory's invoices provided for the collection of attorney's fees.

33.  On July 19, 2006, Nickey Gregory commenced the lawsuit styled as Nickey Gregory Company, LLC v. Robison Farms, LLC, C.A. No. 6:06-CV-02070-HMH (consolidated with C.A. No. 6:06-CV-02144) to enforce its PACA trust rights against Robison Farms and Cindy Robison for unpaid produce in the principal amount of $75,557.75.

**D.    Robison Farms' Bankruptcy**

34.  On August 7, 2006, Robison Farms filed a chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of South Carolina styled as In re Robison Farms, LLC, Case No. 06-3394-hb ("the Robison Farms' bankruptcy proceeding").  AgriCap did not appear on the bankruptcy creditor matrix filed by Robison Farms or enter an appearance in the Robison Farms' bankruptcy proceeding.

35.  Because PACA trust assets are not part of the bankruptcy estate, the bankruptcy court lifted the automatic stay to allow Plaintiffs to collect the PACA trust assets in the PACA Claims Action.  This court subsequently entered a PACA Claims Procedure Order on October 17, 2006, under which 14 produce suppliers asserted PACA trust claims against Robison Farms totaling $716,173.89.

36.  Only $83,606.47 in Robison Farms' trust assets were recovered for the benefit of the Plaintiffs and other PACA trust creditors in the PACA Claims Action.  After fees and costs of collection, a net total of $71,873.87 was disbursed pro rata to all the PACA trust creditors.

9

37.     Nickey Gregory received a total disbursement of $9,146.50 from the PACA Claims

Action, which when deducted from the principal amount of $75,557.75, left a principal

balance due and owing of $66,411.25.

38.     Poppell's Produce received a total disbursement of $4,490.61 from the PACA Claims

Action, which when deducted from the principal amount of $44,775.22, left a principal

balance due and owing of $40,284.61.  Plaintiffs have obtained a default judgment

against Robison Farms and Cindy Robison in the amount of their outstanding balance on

the invoices.  (J.S. ¶ 35.)

39.     Plaintiffs have not sought to enforce the judgment against Cindy Robison.

## II. CONCLUSIONS OF LAW

In 1930, the PACA was enacted to encourage fair trading in the marketing of produce and

to prevent unfair and fraudulent practices in an industry highly susceptible to such practices.

H. Rep. No. 98-543, at 3 (1983), reprinted in 1984 U.S.C.C.A.N. 405, 406.  In the early 1980's,

Congress recognized a significant payment problem in the produce industry.  Id. at 406.

"Congress determined that the increase in non-payment and delinquent payment by produce

dealers threatened the financial stability of produce growers."  Frio Ice, S.A. v. Sunfruit, Inc., 918

F.2d 154, 156 (11th Cir. 1990).  To remedy this problem, Congress amended the PACA in 1984

by creating the 7 U.S.C. § 499e(c) statutory trust "to increase the legal protection for unpaid

sellers and suppliers of perishable agricultural commodities until full payment of sums due have

been received by them."  H. Rep. No. 98-543, at 2 (1983), reprinted in 1984 U.S.C.C.A.N. 406.

PACA trusts are created in favor of growers and sellers of perishable agricultural commodities.

7 U.S.C. § 499e(c)(2).  The trustee is the wholesaler – in this case, Robison Farms.  Id.  The

assets of the trust consist of "perishable agricultural commodities received in all transactions, all inventories of food or other products derived from such perishable agricultural commodities, and all receivables or proceeds from the sale of such commodities and food or products derived therefrom." 7 C.F.R. § 46.46(b) (2007); see 7 U.S.C. § 499e(c)(2). The trust must be preserved until full payment has been made to the growers and sellers. 7 U.S.C. § 499e(c)(2).

PACA trusts are nonsegregated and "floating." 7 C.F.R. § 46.46(b). Because they are nonsegregated, commingling PACA trust assets with non-trust assets is permissible. Id. Because PACA trusts are floating, it is expected and intended that the form of the assets comprising the trust will change over time. Accordingly, the duty imposed upon wholesalers, as PACA trustees, is not to strictly preserve trust property. It is only necessary that wholesalers "maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities." 7 C.F.R. § 46.46(d)(1). "Any act or omission inconsistent with this responsibility, including dissipation of trust assets, is unlawful and in violation of [§ 499b]." Id.

PACA trustees are directed to refrain from dissipating trust assets. Id. "Dissipation" is defined as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers [or] sellers . . . to recover money owed in connection with produce transactions." Id. § 46.46(a)(2). Other aspects of trust administration and fiduciary obligation are guided by principles of general trust law. See, e.g., Albee Tomato, Inc. v. A.B. Shalom Produce Corp., 155 F.3d 612, 615 (2d Cir. 1998).

The PACA mandates that produce suppliers provide notice to the buyer of their intent to preserve trust benefits. Produce suppliers can preserve their trust benefits in one of two ways.

11

First, a produce supplier may include the requisite trust language in its invoices sent to the produce purchaser at, or near the time, of delivery. § 499e(c)(4). Alternatively, a produce supplier may send a Notice of Intent to Preserve PACA Trust Rights within 30 days from the date payment is due. § 499e(c)(3); 7 C.F.R. § 46.46(f)(2).

Failure to maintain the trust and make full payment promptly to the trust beneficiary is unlawful. 7 U.S.C. § 499b(4). "Full payment promptly" is defined as payment within 10 days of acceptance of the produce. 7 C.F.R. § 46.2(aa)(1). However, in no event can the period allowed for making full payment be extended beyond 30 days of receipt. Id. § 46.46(e)(2). If the period is extended beyond 30 days, then growers and sellers are no longer eligible to participate in PACA. Id.

Produce sellers are entitled to recover the trust assets over all other creditors, including secured creditors. § 499e(c)(1); Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d 1374, 1379 (3d Cir. 1994) ("Read in light of the legislative finding, the trust provision also straightforwardly provides unpaid suppliers with priority over secured lenders with regard to PACA trust assets held in trust by produce purchasers. It effectively vitiates a lender's security interest in trust assets held by produce purchasers vis a vis unpaid produce suppliers."); Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997) (PACA puts sellers in position superior to all other creditors). Congress stated that secured financing arrangements, in which produce proceeds are used as security and diverted from the suppliers to lenders, are against the public interest and a burden on commerce, and that the purpose of this law is to remove this burden on commerce. § 499e(c)(1). "If the seller [of produce] is not paid promptly, the trust assets must be preserved and the seller's claims prime those of other secured and unsecured creditors for the full

amount of the claim." <u>Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.</u>, 336 F.3d 410, 413 (5th Cir. 2003) (citing <u>Gargiulo</u>, 131 F.3d at 999 (PACA puts sellers in position superior to all other creditors)).

As a general proposition, third parties are not guarantors of PACA trust assets. <u>C.H. Robison Co. v. Trust Co. Bank, N.A.</u>, 952 F.2d 1311, 1316 (11th Cir. 1992). A bona fide purchaser, who takes trust property for value and without notice of the breach of trust, may retain PACA trust assets without liability to trust beneficiaries. <u>Reaves Brokerage Co., Inc.</u>, 336 F.3d at 413-414; <u>Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.</u>, 67 F.3d 1063, 1068 (2d Cir. 1995); <u>Consumers Produce Co.</u>, 16 F.3d at 1380. Generally, if the third party did not take trust property for value or had notice of the breach, then the third party must disgorge retained trust assets.

AgriCap argues that it is not liable to Plaintiffs because they have not shown Robison Farms breached the PACA trust by entering into the Agreement with AgriCap because the terms of the Agreement are commercially reasonable. Further, even if AgriCap breached the PACA trust, Plaintiffs have not established their compliance with the statutory pre-requisites to participate in any statutory trust. Finally, even if AgriCap breached the PACA trust, it has demonstrated that it was a bona fide purchaser that acquired the accounts receivables for value and without any notice of an alleged breach of the PACA trust by Robison Farms. For the reasons set forth below, the court finds that Robison Farms breached the PACA trust because the Agreement was a loan secured by accounts receivable that encumbered trust assets such that they were not "freely available to satisfy outstanding obligations to sellers of perishable agricultural

13

commodities." 7 C.F.R. § 46.46(d)(1).  Further, the court finds that the bona fide purchaser

defense does not insulate AgriCap from liability to PACA trust beneficiaries.

**A.  Waiver**

As an initial matter, AgriCap raises the defense of waiver, contending that Plaintiffs are

not valid trust creditors of Robison Farms and/or waived their trust rights because their invoices

show 21-day payment terms.  7 U.S.C. § 499e(c)(3) provides as follows:

> The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such
> person has given written notice of intent to preserve the benefits of the trust to the
> commission merchant, dealer, or broker within thirty calendar days (i) after
> expiration of the time prescribed by which payment must be made, as set forth in
> regulations issued by the Secretary, (ii) **after expiration of such other time by**
> **which payment must be made, as the parties have expressly agreed to in**
> **writing before entering into the transaction**, or (iii) after the time the supplier,
> seller, or agent has received notice that the payment instrument promptly presented
> for payment has been dishonored.

(Emphasis added.)  AgriCap argues there must be a prior written payment term agreement

between Plaintiffs and Robison Farms showing that payment was due in 21 days for Plaintiffs to

qualify for trust protection.  Nickey Gregory and Poppell's Produce admit there is no written

payment agreement with Robison Farms.  However, such a written agreement is not required for

PACA trust eligibility for the reasons explained by the court in In re Atlanta Egg & Produce, Inc.,

321 B.R. 746, 755 (N.D. Ga. 2005).

> With respect to the remaining invoices, i.e., those that included payment terms
> other than 10 days, this Court also concludes that those sellers properly preserved
> the benefits of the trust.  While the Court agrees with Appellants that PACA
> requires any agreement to extend payment terms to be in writing, see e.g., 7 U.S.C.
> § 499e(c)(3)(ii), in this case, it is undisputed that there was no such agreement.
> Because there was no agreement – oral or written – to extend the payment terms
> beyond the standard 10 days, the listing of payment terms other than 10 days had
> no legal relevance.  No provision of the statute or regulations disqualifies a seller
> from PACA trust benefits simply because the seller unilaterally changed the
> payment term on the invoice to a period other than the standard 10-day period, but

14

> in no circumstance greater than 30 days. These sellers satisfied the notice
> requirement by including the requisite language on the face of their invoices to
> Atlanta Egg, see 7 U.S.C. § 499e(c)(4), and the payment period on the invoices did
> not exceed thirty days. In compliance with 7 U.S.C. § 499e(c)(4), these sellers,
> therefore, properly preserved their PACA trust benefits.

Id. at 755 (emphasis added). In accord, Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197,

204 (3d Cir. 1998); Stowe Potato Sales, Inc. v. Terry's, Inc., 224 B.R. 329, 333 (W.D. Va. 1998).

Similarly, it is irrelevant as a matter of law whether the course of dealing between

Plaintiffs and Robison Farms allowed more than 10 days for payment of Plaintiffs' invoices by

Robison Farms. Course of dealing does not abrogate the PACA trust. Patterson Frozen Foods,

Inc. v. Crown Foods Int'l, Inc., 307 F.3d 666, 669 (7th Cir. 2002); Idahoan Fresh, 157 F.3d at

205; Hull Co. v. Hauser's Foods, Inc., 924 F.2d 777, 781-82 (8th Cir. 1991); Stowe Potato Sales,

Inc., 224 B.R. at 333; A&J Produce Corp. v. CIT Group/Factoring, Inc., 829 F. Supp. 651, 655

(S.D.N.Y. 1993). There is no evidence that Nickey Gregory or Poppell's Produce entered into

any agreement extending payment terms to Robison Farms, much less an agreement to extend

payment terms beyond 30 days. Based on the foregoing, AgriCap's waiver argument is without

merit.

### B. Secured Loan or Purchase

The ultimate issue before the court for consideration is whether AgriCap is required to

return the trust assets it retained pursuant to the Agreement. AgriCap argues that Plaintiffs have

failed to show any breach of the PACA trust by Robison Farms because the Agreement is

commercially reasonable. Further, AgriCap alleges that the determination of whether the

Agreement was a loan or a purchase is not relevant until the bona fide purchaser defense is an

15

issue.  AgriCap submits that the bona fide purchaser defense is not relevant until the court

determines that the Agreement was commercially unreasonable.

The court disagrees with AgriCap's position.  Commercial reasonableness is not the

initial inquiry in this case.  Instead, the court must first consider whether the Agreement is a loan

secured by the receivables or a true purchase of receivables by AgriCap.  Reaves, 336 F.3d at 417

(noting that because "the so-called factoring agreement in [Reaves] is the functional equivalent

of a secured lending agreement, the . . . 'commercially reasonable' analysis is inapplicable").

If the Agreement is a loan secured by the accounts receivable, the court must determine

whether AgriCap qualifies for the bona fide purchaser exception to liability.  Secured lenders

must return trust property received that has been transferred in breach of the trust "unless they

can establish their status as bona fide purchasers, i.e., that they received the property for value

and without notice of breach of trust."  C.H. Robinson Co., 952 F.2d at 1315.

If the Agreement is a true purchase, only then does the court consider whether the

Agreement is commercially reasonable.  Boulder Fruit Express & Heger Organic Farm Sales v.

Transportation Factoring, Inc., 251 F.3d 1268, 1271 (9th Cir. 2001) (noting that "a commercially

reasonable sale of accounts for fair value is entirely consistent with the trustee's primary duty

under PACA" and finding that undisputed sale of accounts receivable pursuant to a factoring

agreement with commercially reasonable terms was not a breach of the PACA trust).

AgriCap relies on Boulder Fruit and three decisions from the Second Circuit in support of

its argument that the court must first examine commercial reasonableness of the agreement.  See

Am. Banana Co. v. Republic Nat'l Bank of New York, 362 F.3d 33, 38 (2d Cir. 2004); E.

16

Armata, Inc. v. Korea Commercial Bank of New York, 367 F.3d 123, 123 (2d Cir. 1995); D.M. Rothman v. Korea Commercial Bank of New York, 411 F.3d 90, 94, 99 (2d Cir. 2005).

First, in Boulder Fruit, the Ninth Circuit evaluated whether a factoring agreement under which the third party purchased the accounts receivable for 80% of their face value was commercially reasonable. 251 F.3d at 1271. The Ninth Circuit rejected the argument that "factoring agreements per se breach the PACA trust because, by definition, they contemplate the sale of trust receivables at less than their face value." Id. Instead, the court noted that "[t]o the contrary, a commercially reasonable sale of accounts for fair value is entirely consistent with the trustee's primary duty under PACA and 7 C.F.R. § 46.46(d)(1)–to maintain trust assets so that they are freely available to satisfy outstanding obligations to sellers of perishable commodities." Id. (internal quotation marks omitted). The court also held that third parties are "liable only if they had some role in causing the breach or dissipation of the trust." Id. at 1272.

The court indicated that a determination of commercial reasonableness depends upon the terms of the agreement and that "a trustee who factors accounts at a commercially reasonable rate would not" breach the PACA trust. Id. The court held that the factoring agreement was commercially reasonable and did not breach the PACA trust or otherwise dissipate the trust. Further, the court found that the third party did not dissipate the trust because the third party "paid [the trustee] more for trust assets than those assets were worth." Id. at 1272.

Notably, the Ninth Circuit did not analyze the risk of loss to determine whether the factoring agreement was a true purchase or a loan. Instead, the agreement was an undisputed purchase of accounts receivable. Further, the third party did not dissipate the trust assets because it paid more than the assets were worth. The court finds that Boulder Fruit is inapplicable to the

17

Agreement in this case where the parties dispute whether the Agreement is a purchase of accounts receivable or a loan secured by accounts receivable.

In addition, the Second Circuit cases relied on by AgriCap are distinguishable from the case at bar. In <u>American Banana</u>, <u>E. Armata</u>, and <u>D.M. Rothman</u>, the Second Circuit considered claims by PACA creditors against third-party banking institutions that provided overdraft privileges on accounts to PACA trustees. In <u>American Banana</u>, the Second Circuit noted that "the imposition of liability on [the bank] under the facts . . . would impose an impossible burden on banks to monitor each check drawn on an overdrawn PACA trust account, which would be inconsistent with well-established banking law." 362 F.3d at 42. Further, the court, citing <u>Boulder Fruit</u>, stated "Nor are we convinced that a trustee's payments of commercially reasonable fees and interest in exchange for routine banking services such as check cashing services and overdraft privileges extended to facilitate payments to beneficiaries necessarily constitute a breach of the PACA trust." <u>Id.</u> Ultimately, the Second Circuit did not reach these issues because the PACA creditors had disqualified themselves from PACA trust protection.

In <u>E. Armata</u>, the Second Circuit, again relying heavily on <u>Boulder Fruit</u>, found that "a PACA trustee's payment of interest and fees to maintain a checking account with overdraft privileges does not per se constitute breach of the PACA trust." 367 F.3d at 133. In turn, the court concluded that "a PACA trustee's payment of 'commercially reasonable' interest and fees to maintain a checking account in support of its duty to maintain trust assets as 'freely available' to repay his PACA creditors does not constitute a breach of trust under PACA." <u>Id.</u> at 134.

In <u>D.M. Rothman</u>, the Second Circuit remanded the case for the district court to ascertain whether the bank retained any trust funds apart from the bounced check fees, monthly interest,

18

and service fees "and, if so, whether such retention was commercially reasonable." 411 F.3d at

101.  The court, relying on its previous decision in E. Armata, noted that "the costs associated

with maintaining an account for PACA trust funds does not breach a PACA trustee's obligations

provided the costs are commercially reasonable." Id. at 100.   In addition, the Second Circuit

noted that "[i]n the event the district court finds that [bank's] retention of any funds was not

commercially reasonable, [the bank] may assert any applicable defenses." Id. at 101.

The overdraft fees and interest charges in the cases discussed above were revolving lines

of credit.  However, as an initial matter, those cases are distinguishable from the case at bar

because the Second Circuit cases did not involve loans secured by accounts receivable.  See Am.

Banana Co., 362 F.3d at 38 (defendant bank was neither an investor in nor a secured lender to

debtor corporation); E. Armata, Inc., 367 F.3d at 123 (revolving line of credit was not secured by

debtor's receivables from the sale of produce); D.M. Rothman, 411 F.3d at 94, 99 (depository

bank's revolving line of credit was not secured by debtor's accounts receivables).

Further, to the extent the Second Circuit cases are inconsistent with the court's

determination that it must first consider whether the Agreement is a secured loan or a true

purchase, the Second Circuit has clarified those holdings.  The Second Circuit, in a recent

decision, Coosemans Specialties, Inc. v. Garguilo, 485 F.3d 701, 706-07 (2d Cir. 2007), noted,

"We have never held that a PACA trustee can escape all liability for entering into a transaction

that results in a large loss of PACA assets merely by showing that the transaction was

commercially reasonable on its face."  The court went on to hold that the factoring agreement

violated the PACA trust irrespective of whether it was commercially reasonable because there

was "no factual dispute that the factoring agreement jeopardized the trust funds and made them unavailable for timely payment to plaintiffs." Id. at 707.

In addition, in a recent Second Circuit decision, A&J Produce Corporation v. Bronx Overall Economic Development Corporation, 542 F.3d 54, 58 (2d Cir. 2008), the court held, in a case where the parties disputed whether the transaction was a purchase or a secured loan, that the court must first analyze the risk of loss. In A&J Produce, a PACA dealer purchased unit shares in a cooperative association and the defendant made a loan to the PACA dealer, guaranteed and secured by the units. In 2001 and 2002, certain PACA creditors filed complaints against the PACA dealer for failure to pay for purchased produce. Id. at 57. The PACA dealer defaulted on the loan in 2001 and the defendant instituted foreclosure proceedings. Id. The plaintiff moved to enjoin the foreclosure action and by agreement of the parties, the plaintiff purchased the units and deposited the proceeds into the court pending resolution of the lawsuit. Id. The defendant alleged that the "grant of a lien on the Units constituted a transfer of the trust assets such that they were removed from the PACA trust in favor" of the defendant. Id. at 58.

The Second Circuit stated that it was "necessary . . . to first determine the substance of the transaction by analyzing the transfer of risk involved, in order to resolve whether the lien constituted a purchase for value or merely a security interest." Id. Quoting Reaves, 336 F.3d at 413-14, the Second Circuit stated that "[o]ther courts have similarly found that for PACA purposes, 'lenders who receive trust assets through enforcement of a security agreement are not bona fide purchasers . . . because such transfers are not 'for value.'" 542 F.3d at 59. After analyzing the risk of loss, the Second Circuit determined that the defendant's liability was secondary. Therefore, the Second Circuit held that "a secured creditor's lien does not constitute

a transfer of PACA trust assets within the terms of the statute, and proceeds generated from the sale of such assets are therefore properly awarded to the PACA creditors." Id. Notably, the court never considered whether the transaction was commercially reasonable. Based on the foregoing, the court agrees with the analysis in Reaves and A&J Produce, that the court must initially evaluate whether the Agreement was a true purchase or a loan secured by accounts receivable. The resolution of this issue directs whether, in the case of true purchase, the court evaluates the Agreement for commercial reasonableness, or, in the case of a secured loan, the bona fide purchaser defense protects AgriCap from liability.

Whether the agreement is a secured loan or a true purchase of receivables turns on whether there was an actual transfer of the risk of loss from Robison Farms to AgriCap. A transfer of risk occurs when the account seller's debt is extinguished, and the account purchaser's "risk with regard to the performance of the accounts is direct." Endico Potatoes, Inc., 67 F.3d at 1069. The determination of whether there was a true purchase of receivables requires a review of the substance of the parties' relationship, and all terms and provisions of the Agreement, without regard to how the transaction is labeled. A&J Produce Corp., 542 F.3d at 58; Reaves Brokerage Co., 336 F.3d at 414. This entails a review of whether there are other indicia of a secured transaction, such as a security agreement, UCC-1 financing statement, internal charges, and personal guarantees. Reaves Brokerage Co., 336 F.3d at 414.

Section 4.1 of the Agreement between Robison Farms and AgriCap addresses the transfer of risk. The section states in pertinent part:

> **4.1    Seller's Agreement to Repurchase.** Seller agrees to pay to Buyer, on demand, the full face amount, or any unpaid portion of, any Purchased Receivable:

(a)     which remains unpaid for the Payment Period unless, prior to the
        expiration of the Payment Period, the subject Account Debtor has
        become Insolvent; or

(b)     with respect to which there has been any breach or warranty or
        representation set forth in Section 6 of this Agreement or any
        breach of any covenant contained in this Agreement; or

(c)     with respect to which the Account Debtor asserts any Dispute
        which remains unsettled thirty (30) days after the due date of such
        Purchased Receivable.

(Def.'s Ex. 1 (Agreement, Section 4.1).)

        Robison Farms essentially bears the risk of loss on all accounts.  In subsection (a), the

risk is transferred to AgriCap only if the account debtor becomes insolvent within 90 days from

the invoice date.  Insolvency is narrowly confined to Robison Farms' customers filing for

bankruptcy or executing an assignment for the benefit of creditors within 90 days of the invoice

date.  (Id. Ex. 1 (Agreement, Section 1.13).)  However, the second exception in subsection (b)

negates the transfer of risk in subsection (a) because in subsection (b) Robison Farms agrees to

pay the unpaid portion of a purchased receivable if there has been any breach of warranty as set

forth in Section 6 of the Factoring Agreement.

        In Section 6.1(g) of the Factoring Agreement, Robison Farms warrants that, at the time

AgriCap makes an advance (including future advances), Robison Farms has no knowledge that

any account debtors may become insolvent within 90 days.  Section 6.1(g) of the Factoring

Agreement states in pertinent part:

> **Receivables' Warranties, Representations and Covenants.**  To induce Buyer to
> buy Eligible Receivables and to render its services to Seller, and with full
> knowledge that the truth and accuracy of the following are being relied upon by
> Buyer in determining whether to accept Eligible Receivables as Purchased
> Receivables, Seller represents, warrants, covenants and agrees, with respect to

22

> each Schedule of Accounts delivered to Buyer and each Receivable described
> therein, that:
>
> . . . .
>
> g.    At the time that Buyer makes an Advance relating to a Purchased
> Receivable, none of the Account Debtors set forth in the Schedule of Accounts is
> then Insolvent and Seller has no knowledge that the Account Debtors are Insolvent
> or may become Insolvent within the Payment Period; . . . .

(Id. Ex. 1 (Agreement, Section 6.1(g)).)  Thus, any allegation that Robison had any knowledge

that the account debtor might become involved in an insolvency proceeding negates the transfer

of risk set forth in subsection (a).  (Id. Ex. 1 (Agreement, Sections 4.1, 6.1(g)).)  Subsection (c)

further insulates AgriCap from the risk of loss by stating that the risk of loss does not transfer to

AgriCap if the account debtor asserts "any Dispute which remains unsettled thirty (30) days after

the due date of the Purchased Receivable."  Section 1.9 of the Factoring Agreement broadly

defines "Dispute" as:

> 1.9    **"Dispute"** shall mean a dispute, claim or defense of any kind
> whatsoever, asserted by an Account Debtor, whether valid or
> invalid, that may reduce the amount collectible by Buyer from
> Account Debtor.

(Id. Ex. 1 (Agreement, Section 1.9).)  Thus, if an account debtor provided any reason for not

paying the receivable or any portion thereof, there is no transfer of the risk.

In sum, there has been no transfer of the risk of nonpayment to AgriCap.  The only

reasons an account debtor would not pay are because the account debtor (1) does not have the

money to pay the debt, or (2) raises any dispute about payment of the debt.  Under the terms of

the Agreement, AgriCap is insulated from loss in these two circumstances.

The provisions discussed above are the same kind of provisions which the court in

Reaves found did not transfer the risk of non-payment.  336 F.3d at 415.  The court in Reaves

23

explained that the parties had "confected" a secured loan or revolving line of credit, rather than a true sale of assets, through a percentage advance subject to the lender maintaining a reserve in any amount the lender deemed appropriate.  Id. at 415-16.  In exactly the same fashion, Robison Farms was paid through a system of advances which were subject to the maintenance of a reserve in whatever amount AgriCap decided to protect it against any non-payment by the account debtors.  (Def.'s Ex. 1 (Agreement, Sections 2.2.2 and 2.4).)

Similar to the lender in Reaves, AgriCap also insulated itself from the risk of loss through a blanket security interest on all of Robison Farms' assets, and a personal guarantee by the principal of Robison Farms.  (Id. Ex. 1 (Agreement, Sections 2.2.1 (b), (c), and (d)).); (Pls.' Mem. Supp. Summ. J. Ex. J (Security Agreement), Ex. L (Subordination Agreement), & Ex. K (Personal Guaranty).); Reaves, 336 F.3d at 416.  AgriCap also filed a UCC-1 financing statement listing as collateral all of Robison Farms' assets, not just the accounts receivable.  (Pls.' Mem. Supp. Summ. J. Ex. M (UCC-1 Financing Statement).); Reaves, 336 F.3d at 416.

Moreover, other evidence in this case supports the conclusion that the financial transaction between AgriCap and Robison Farms was not a true purchase of accounts.  Before entering into the Agreement in March 2005, AgriCap presented Robison Farms with a Preliminary Term Sheet identifying Robison Farms as "Borrower" and AgriCap as "Lender." (Pls.' Mem. Supp. Summ. J. Ex. G (Preliminary Term Sheet).)  At the end of the relationship, AgriCap prepared an internal accounting document stating that AgriCap should write-off $8,001.03 as a "bad loan" to Robison Farms.  (Pls.' Mem. Supp. Summ. J. Ex. R (Internal Accounting Document).)  In addition, AgriCap charged interest of prime plus 6% on all the advances, which is a hallmark of a lending transaction.  (Def.'s Ex. 1 (Agreement, Section 3.4).)

In sum, the Agreement between AgriCap and Robison Farms is actually a loan secured by accounts receivable. The court finds that Robison Farms has breached its trust obligations. The Agreement constitutes a breach of trust by Robison Farms because the Agreement encumbered trust assets such that they were not "freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities." 7 C.F.R. § 46.46(d)(1). As a result, Robison Farms' trust assets were dissipated. Therefore, AgriCap as a secured lender, must return any retained trust property unless it can establish itself as a bona fide purchaser.[1] See C.H. Robinson Co. v. Trust Co. Bank, N.A., 952 F.2d 1311, 1315-16 (11th Cir. 1992) (Secured lenders must return property which is subject to trust under PACA unless the lenders can establish their status as bona fide purchasers.).

### C. Bona Fide Purchaser Defense

Only a bona fide purchaser, who takes trust property for value and without notice of the breach of trust, may retain PACA trust assets without liability to trust beneficiaries. Reaves Brokerage Co., 336 F.3d at 413-14; Endico Potatoes, Inc., 97 F.3d at 1067; Consumers Produce Co., 16 F.3d at 1380. "A transfer is for value if money is paid or other property is transferred or services are rendered as consideration for the transfer of trust property." Reaves Brokerage Co., 336 F.3d at 413 (internal quotation marks omitted).

"[T]ransfers of trust property such as accounts receivable are not for value under traditional trust law." See C.H. Robinson Co., 952 F.2d at 1315 (noting that if payments on accounts receivable were received in satisfaction of a secured loan, then the payments must be

---

[1] Although confusing, the "bona fide purchaser" defense in this connection is an inquiry involving a secured loan.

25

returned to trust beneficiaries); Reaves, 336 F.3d at 417 (A secured lending agreement under which a lender holds a borrower's accounts receivable as collateral is not a transfer for value.). As set forth above, the Agreement is a secured lending agreement under which AgriCap held Robison Farms' accounts receivable as collateral and Robison Farms remained liable for any account debtor's failure to pay. Therefore, AgriCap is not a bona fide purchaser because the transfer of accounts receivable under a secured lending arrangement is not for value. To hold otherwise would permit secured creditors to "trump" unpaid PACA beneficiaries while circumventing the intent of Congress, which has declared that these types of secured lending agreements are a burden on commerce and contrary to public interest. 7 U.S.C. § 499e(c)(1). Based on the foregoing, AgriCap cannot retain any trust assets without liability to the PACA creditors.

### D. Damages

Because the financial arrangement was a loan secured by accounts receivable and the bona fide purchaser defense is unavailable to AgriCap, it must disgorge trust assets retained from the accounts receivable of Robison Farms. Plaintiffs argue that AgriCap must disgorge trust assets that it obtained in the full amount required to satisfy Plaintiffs' claims plus attorney's fees. Plaintiffs allege as follows:

> Agricap is not entitled to receive a credit for its loan advances which never were passed on to the plaintiffs by Robison Farms. The funds advanced by Agricap to Robison Farms were not replenishing a segregated account for the PACA trust creditors. If that were so, then the trust beneficiaries would have been paid in full. Because the Agricap monies were being use[d] to pay a variety of expenses in addition to produce suppliers, the Robison Farms' produce suppliers suffered a collective shortfall of $716,173.89 . . . and plaintiffs suffered a shortfall in the principal amount of $106,695.86.

(Pls.' Dec. 15, 2008, Letter at 2.)  The court disagrees.  Plaintiffs' untenable position would impose a greater duty on AgriCap than is imposed on Robison Farms.  PACA trusts are nonsegregated and "floating."  7 C.F.R. § 46.46(b).  As a result, commingling PACA trust assets with non-trust assets is permissible.  Id.  The wholesaler is not required to strictly preserve trust assets.  Instead, the wholesaler's duty is to "maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities."  Id. § 46.46(d)(1).  AgriCap is not required to disgorge all of the trust assets that it received.

Instead, AgriCap must disgorge any retained trust assets.  Third parties are not guarantors of PACA trust assets.  C.H. Robison Co., 952 F.2d at 1316.  AgriCap's "liability – if any – for receipt of PACA trust funds would be limited to PACA funds . . . actually retained."  D.M. Rothman & Co., 411 F.3d at 99 (2d Cir. 2005).  AgriCap argues that if it is liable to Plaintiffs, its liability should be limited to $81,799.18, in fees and interest that it actually retained.  However, AgriCap paid Robison Farms $3,964,905.46,[2] which Robison Farms had at its disposal to pay PACA creditors.  (J.S. ¶¶ 23-24.)  AgriCap received $4,053,596.21.  (Id.)  Based on the foregoing, AgriCap dissipated the trust assets by $88,690.75.  Therefore, the court finds that the

---

[2] This figure consists of $3,953,638.99 paid directly to Robison Farms, and $11,266.47 paid directly to a PACA creditor on behalf of Robison Farms.  (Def.'s Dec. 12, 2008, Letter.); (Def.'s Ex. 8 (Client Activity Statement at AC003405-3406).)

Plaintiffs are entitled to recover these retained trust assets from AgriCap.

### E. Attorneys' Fees and Prejudgment Interest

The case law supports an award of attorney's fees to PACA trust creditors who have the requisite attorney fee language on their invoices as "sums owing in connection with such transactions." 7 U.S.C § 499e(c)(2). Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d 701, 707 (2d Cir. 2007); Country Best v. Christopher Ranch, LLC, 361 F.3d 629, 632 (11th Cir. 2004); Middle Mountain Land and Produce, Inc. v. Sound Commodities, Inc., 307 F.3d 1220, 1224 (9th Cir. 2002). The language on Nickey Gregory's invoices to Robison Farms provides in pertinent part: "Interest at 1.5% added to unpaid balance. Interest and attorney's fees necessary to collect any balance due hereunder shall be considered sums owing in connection with this transaction under the PACA trust." (Pls.' Mem. Supp. Summ. J. Ex. C (Invoices of Nickey Gregory).) AgriCap argues that Nickey Gregory is not entitled to attorney's fees based on the attorney fee provision on its invoices because the phrase "sums owing in connection with the transaction" defines the duration of the trust rather than a substantial right to fees and other sums owed. However, as noted, the case law is to the contrary. Therefore, the Plaintiffs are entitled to an award of attorney's fees.

AgriCap also argues that any attorney's fees should not be paid by AgriCap. However, AgriCap retained PACA trust assets, and Nickey Gregory's attorney's fees are part of the trust claim. Therefore, attorney's fees should be satisfied out of the trust assets retained by AgriCap. E. Armata, Inc., 887 F. Supp. at 594-95 (noting that since plaintiff "has taken legal action to collect past due amounts, its attorneys fees constitute 'sums owing in connection with such transactions' and are payable from the PACA trust amounts"). Therefore, Nickey Gregory is

28

entitled to attorney's fees.  The court finds that any attorney's fees must be paid out of the $88,690.75 in PACA trust proceeds retained by AgriCap.  (Pls.' Trial Br. at 23 (stating that "AgriCap received the PACA trust assets, and if the fees are part of the trust claim, then they should be satisfied out of the trust assets obtained by AgriCap").)

The court declines to award Plaintiffs prejudgment interest on the claims.  The PACA does not explicitly provide for an award of prejudgment interest, and awarding prejudgment interest is within the discretion of the trial court.  Endico Potatoes, Inc., 97 F.3d at 1071 ("The decision whether to grant prejudgment interest and the rate used if such interest is granted 'are matters confided to the district court's broad discretion . . . .'").  This court does not believe an award of prejudgment interest is warranted in this case.

It is therefore

**ORDERED** that judgment is granted in favor of Plaintiffs in the amount of $88,690.75 in damages and attorney's fees.  It is further

**ORDERED** that AgriCap disgorge the PACA trust assets in the amount of $88,690.75 to Plaintiffs.  It is further

**ORDERED** that Nickey Gregory has 15 days to submit a request for reasonable attorney's fees from the PACA trust proceeds of $88,690.75 retained by AgriCap.  It is further

**ORDERED** that Plaintiffs' claim for prejudgment interest is denied.  It is further

**ORDERED** that to the extent this order is inconsistent with the findings in the court's September 2, 2008, order denying Plaintiffs' summary judgment motion, those findings are vacated.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
United States District Judge

Greenville, South Carolina
December 19, 2008.

30